UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                              :
GULF INSURANCE COMPANY,                       :      04 Civ. 4456 (RJH)
                                              :      04 Civ. 4457 (RJH)
                      Appellant,              :
                                              :
        -against-                             :      **MEMORANDUM**
                                              :      **OPINION AND ORDER**
SUSAN GLASBRENNER, et al.,                    :
                                              :
                      Appellees.              :
                                              :
----------------------------------------------------------------x

        These related cases come before the Court as appeals from a pair of decisions

issued by the Bankruptcy Court for the Southern District of New York under the caption

*In re: Caldor, Inc.*, 95-B-44080 (CB) (the "Caldor Bankruptcy Case").  Both appeals

are—at least superficially—related to the 1995 bankruptcy of the Caldor Corporation,

which, before it collapsed, was one of the country's largest department store operators.

But neither appeal has been brought to challenge the liquidation and ultimate dismissal,

by order dated November 8, 2001, of the Caldor Bankruptcy Case.  Indeed, Caldor has

not even appeared in connection with these appeals, which is some indication of how

tenuous is their connection to the underlying bankruptcy proceedings.

        What connection there is can be summarized as follows.  The appellant here is the

Gulf Insurance Company ("Gulf"), which issued an "excess" insurance policy to Caldor

in 1994, before its bankruptcy.  Appellees are David and Susan Glasbrenner (collectively,

the "Claimants"), who together held tort claims against Caldor that were stayed after its

1995 bankruptcy filing.  In March 2001, Claimants received a lift-stay order; two years

later, in late 2003, they won a multi-million dollar judgment against Caldor in New

Jersey state court. Pursuant to the lift-stay order, however, that judgment was to be collected, if at all, out of Caldor's insurance, which was limited to Gulf's excess policy. Gulf responded to these events by filing for declaratory relief in the Southern District of New York in 2004 in an effort to litigate its obligations under the 1994 excess policy.

After the declaratory action was dismissed in late 2004 for improper venue, Gulf filed an adversary complaint in the Caldor Bankruptcy Case—which, as noted, had been dismissed in November 2001—against Claimants. In doing so, Gulf sought from the bankruptcy court an order vacating the lift-stay order that allowed Claimants to proceed in New Jersey; in the alternative, Gulf filed a motion to "enforce" an earlier (and lesser) award that Claimants had received in 1999 after participating in the Caldor Bankruptcy Case's mandatory alternative dispute resolution program (the "ADR Program"). In both instances, Gulf argued that Claimants failed to file a timely Notice of Intent to Litigate ("NIL") the ADR award, which, under the ADR Program rules, would mean that the award became "final and binding."

By orders dated May 3, 2004, the bankruptcy court denied Gulf's motion to enforce the ADR Program rules and dismissed the adversary complaint seeking, *inter alia*, to vacate the lift-stay orders. Gulf now appeals those rulings. For the reasons stated below, this Court affirms both of the Bankruptcy Court's orders.

### BACKGROUND

The events relating to and preceding these appeals span several years and multiple jurisdictions, including at least one appearance before the Second Circuit, whose limited exposure to the history of these proceedings prompted use of the word "tortuous." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 354 (2d Cir. 2005). Although this Court would

certainly concur in that characterization, proper context requires some description of the "four separate civil actions" and "one non-binding arbitration" that brought Gulf and the Claimants first to district courts in the Southern District of New York and the District of New Jersey, then to the Second Circuit, then to the Bankruptcy Court, and, now on appeal, to this Court. *Id.* In providing that context, citations to the amended records are included where available and appropriate.[1]

**A. Generally**

Appellant Gulf is a Connecticut corporate subsidiary of Travelers Property & Casualty and has a principal place of business in New York. Appellee Claimants are New Jersey residents. Caldor is an inactive New York corporation that—as noted— owned and operated department stores throughout the Northeast before filing for bankruptcy in 1995 and being liquidated in 2001. On November 30, 1993, Gulf issued a "commercial umbrella policy" to Caldor, effective August 4, 1993 to August 4, 1994, pursuant to which Gulf agreed to an occurrence and aggregate limit of $10,000,000 (the "Policy"), but was to act as a secondary insurer. (4457 Record at 32–45).[2]

On April 17, 1994, during the Policy's effective period, Appellee-Claimant Susan Glasbrenner was injured in a Caldor department store in New Jersey. (4457 Record at 163). Approximately ten months later, on February 1, 1995, Claimants filed a personal injury suit against Caldor in New Jersey state court. While that suit was pending, on September 18, 1995, Caldor filed for Chapter 11 bankruptcy protection in the Southern

---

[1] Because the Court is addressing two appeals in this decision, it has before it two different records on appeal. In citing to these records, the Court will adopt the following conventions: citations to the record associated with the first-filed of these appeals, which is docketed as 04 Civ. 4456 (RJH), shall be designated "4456 Record"; citations to the second of these records, which is associated with the case docketed as 04 Civ. 4457 (RJH), shall be designated "4457 Record." In many (if not most) cases, material cited in one record will also be contained in the other. The Court has cited to the first source it found.

[2] Caldor maintained primary coverage, with a $750,000 occurrence limit (excess of $250,000 self-insured retention), through an unrelated (and not apparently insolvent) insurance company.

District of New York. As a result of the filing, all pre-petition claims against the company, including Claimants' personal injury lawsuit, were automatically stayed pursuant to 11 U.S.C. § 362. In June 1996, Claimants appeared in the Caldor bankruptcy case by filing a proof of claim.

Thereafter, on February 11, 1998, by order signed by Judge James L. Garrity, Jr., the bankruptcy court adopted a mandatory alternative dispute resolution program (the "ADR Program") to hear and resolve certain pre-petition claims, including Claimants', on either a binding or non-binding track. (4456 Record 74–77.) Although it is undisputed that Claimants chose the non-binding option, paragraph 40 of ADR Program rules provided that even non-binding awards would become "final and binding . . . without further action" unless a NIL was "serve[d] and file[d]" with the clerk of the bankruptcy court within ten days of being formally notified of the award. (4456 Record at 57.)

On August 12, 1999, Claimants received a non-binding ADR award of $450,000 (the "ADR Award") and, as provided by paragraph 40 of the rules, the ten-day NIL filing deadline began to run. (4456 Record at 57.) The events that followed are the focus of these appeals.

### B. The August 23, 1999 "Ten Day" Deadline and the Lift-Stay Orders

On August 23, 1999, ten days after the August 12 filing deadline began to run, the ADR Program rules provided that Claimants' award was to become "final and binding." Gulf now argues on appeal, as it did below, that Claimants did not file the NIL until September 1, 1999, as evidenced by the fact that the NIL was not date stamped by the clerk of the bankruptcy court until September 1, more than ten days after the deadline

expired.  Claimants respond—also as they did below—that they timely filed the NIL on August 20, 1999, as evidenced by the "Acknowledgment of Service" card addressed to "Clerk, U.S. Bankruptcy Court" at "One Bowling Green," and noting "Glasbrenner" just above the address, which was signed by a deputy clerk, "F. Hayne," on August 20.  (4456 Record at 272; *see also* Hr'g Tr. 3, Nov. 17, 2006.)  Claimants counsel at the time has also testified (via sworn affidavit) that on August 19, 1999 he provided the "New Jersey Lawyers Service" (presumably a messenger service specializing in court filings) with Claimaints' NIL for filing, accompanied by a cover letter dated the same day.  (Robert Fendt Aff. ¶¶ 5-6, Jan. 20, 2004 ("Fendt Aff."), 4456 Record at 206–08.)

This is the totality of the evidence on the subject, presumably because nobody questioned the filing date at the time.  Indeed, all parties—including Caldor itself—appear to have proceeded on the assumption that the NIL was timely filed.  Thus, on September 27, 1999 Caldor filed an "Application for an Order Granting [Claimants] Limited Relief from the Automatic Stay," pursuant to which Claimants would be allowed to pursue their tort claims against Caldor in the Southern District of New York, and, should they prevail, would be accorded status as "general unsecured" creditors.  (4457 Record 82–90.)  Caldor specifically notes in paragraph 14 [should be 12] of the application that Claimants "mailed a [NIL] to [their] . . . attorneys" after receiving the $450,000 ADR award.  (*Id*. at 87.)  The application further notes that "insofar as the . . . Claimant[] ha[s] satisfied the prerequisites for referral . . . in accordance with . . . the [ADR Program] . . . [Caldor] respectfully requests that their present [motion] be granted." (*Id*.)

By order dated October 21, 1999, the bankruptcy court granted Caldor's motion to lift the automatic stay (the "First Lift-Stay Order"), and also authorized the Claimants to seek modification of the lift stay if warranted, which they did with a second motion on January 30, 2001.  (4457 Record at 91–93.)  This second motion, which was granted on March 5, 2001, again represented that:

> Claimants . . . timely filed proofs of claim . . . [and] participated in the . . . ADR Procedure, . . . [receiving] a non-binding arbitration award on August 12, 1999.  [Claimants] mailed a Notice of Intent to Litigate to the attorneys who represented [Caldor] at the arbitration.

Once granted, the second motion also allowed claimants to pursue their claim against Caldor in New Jersey (as opposed to the Southern District of New York), as long "any . . . judgment entered in favor of [Claimants] will be limited solely to the proceeds of [Caldor's] applicable insurance coverage, and will not be collectible against or realized from [Caldor's] assets nor act as a claim against [Caldor] in the . . . Chapter 11 case" (the "Second Lift-Stay Order").  (4457 Record at 136–37.)

Approximately six months later, on October 2, 2001, the bankruptcy court issued an order authorizing Caldor's final distribution and inviting Caldor to submit an order dismissing the Chapter 11 cases (the "Final Distribution Order").  (4457 Record at 187–98.)  Finding "N" of the Final Distribution Order notes that "[t]he Debtors have completed the winding up of their respective business affairs and have disposed of all claims by and against the Debtors in accordance with . . . orders of the Court."  (*Id.* at 190.)  As contemplated by the Final Distribution Order, the bankruptcy court dismissed the Caldor Bankruptcy Case on November 8, 2001.  (4457 Record at 76–77.)

### C.  The New Jersey Action and Subsequent Events

Claimants' personal injury action against Caldor (the "New Jersey Action") commenced more than a year and a half later, on April 7, 2003, and resulted in an award of $2,647,827.91, including interest.  Gulf appealed the verdict and, on April 24, filed a separate complaint against Claimants in the Southern District of New York seeking, among other things, a declaratory judgment that it could not be made to pay the New Jersey award because (i) the terms of the Policy had not been met; and (ii) Claimants failed to file a timely notice of claim with Gulf (the "New York Declaratory Action"). On June 11, 2003, Claimant filed a motion to dismiss the New York Declaratory Action, arguing improper venue, as well as lack of subject matter and personal jurisdiction.[3]

Claimants also filed a complaint against Gulf in New Jersey state court (the "New Jersey Declaratory Action"), essentially seeking to force payment under the Policy of the award in the New Jersey Action, and also alleging claims for garnishment, declaratory relief, breach of contract and breach of good faith and fair dealing.  On July 14, 2003, Gulf removed the New Jersey Declaratory Action to federal court, where it was assigned to Judge Rodriguez.  By order dated November 12, 2003, Judge Rodriguez stayed the New Jersey Declaratory Action (upon Gulf's motion) pending the outcome of the first-filed New York Declaratory Action.  (4457 Record at 176–83.)  To this Court's knowledge, it remains stayed today.

After the stay, the focus of the dispute returned to the New York Declaratory Action, which had been (and still is) assigned to Judge Stanton.  On October 3, 2003, Gulf filed a motion in the New York Declaratory Action to withdraw or enforce the "automatic bankruptcy reference."  Before ruling on that request, on November 19, 2003,

---

[3]  After Gulf filed an amended complaint, Claimants renewed their motion to dismiss.

Judge Stanton dismissed the case on the ground that venue was improper in New York, both under 28 U.S.C. § 1391, which governs venue generally, and 28 U.S.C. §§ 1408 and 1409, which govern bankruptcy venue under Title 11. *Gulf Ins. Co. v. Caldor Corp.*, 2003 WL 22764542 (S.D.N.Y. Nov. 20, 2003). In reaching the latter conclusion, Judge Stanton reasoned that:

> [T]he Bankruptcy Court [in the Caldor Bankruptcy Case] effectively excluded Caldor's insurance coverage from its bankruptcy estate, and no relief can be sought against Caldor in the Bankruptcy Court because that Court specifically forbade claims against or recovery from the Caldor estate. There is [thus] no retained jurisdiction in the bankruptcy case on which to premise venue.

*Id.* at *3.

Gulf appealed Judge Stanton's ruling to the Second Circuit, and, on November 24, 2003, also filed an adversary complaint against Claimants in the original (and long since dismissed) Caldor Bankruptcy Case. The first count of the adversary complaint seeks to "revoke[], annul[], terminate[] and/or modif[y]" the Second Lift-Stay Order, pursuant to which the Claimants were allowed to bring the New Jersey Action against Caldor, as long as any judgment entered in that case was limited to Caldor's insurance.[4] Approximately one month later, on December 22, 2003, Gulf filed a motion (the "ADR Enforcement Motion") in the Caldor Bankruptcy Case to "enforce" the February 11, 1998 order establishing the ADR Program and setting its rules (the "ADR Program Order"). Both the adversary complaint and the ADR Enforcement Motion depend crucially on Gulf's claim that Claimants did not file the NIL within the ten-day deadline, which would

---

[4] Counts two through twelve of the Adversary Complaint essentially seek the same relief Gulf sought in the New York Declaratory Action, namely, a judgment shielding it from liability to the Claimants under the Policy.

mean both that the Second Lift-Stay Order was improvidently granted, and that the ADR Award became "final and binding."

Claimants responded by filing a motion to dismiss the adversary complaint and opposing the ADR Enforcement Motion. The bankruptcy court heard oral argument on both issues at a hearing on February 25, 2004, after which, by orders dated May 3, 2004, it dismissed the adversary complaint and denied the ADR Enforcement Motion. (4456 Record at 342–43; 4457 Record at 227–28.) Each of the May 3 orders indicates that it is being entered "for the reasons stated on the record" on February 25, 2004. This Court's review of those decisions on appeal will therefore turn on the factual and legal conclusions reached at that hearing, to which the Court now turns.

### D. The February 25, 2004 Hearing

The February 25, 2004 hearing, which was attended by counsel for Gulf, Claimants, and Caldor, and presided over by Judge Cornelius Blackshear, largely focused on Gulf's claim that the NIL was not filed until September 1, 1999. After considering the evidence, the bankruptcy court rejected that argument and found that the NIL "was filed by [Claimants] on August 20, 1999." (Hr'g Tr. 8–9, Feb. 25, 2004 ("Feb. 25 Tr.").) The apparent bases for this conclusion are as follows: First, the acknowledgment of service card signed and dated by a clerk of the bankruptcy court on August 20, 1999 was enough evidence to support the earlier filing date. Second, "filing" the NIL only required "delivering documents to the proper authority," which, as evidenced by the acknowledgment of service card, was done in this case. (Feb. 25 Tr. 11.) Finally, the September 1, 1999 date stamp on the NIL was the date it was docketed by the bankruptcy clerk, a date that very often does not match up with—and is therefore not equivalent to—

the underlined filing date (Feb. 25 Tr. 6–7, 10). These conclusions—and Gulf's objections to them—are more fully described in the discussion portion of this opinion, *infra*.

The remainder of the hearing addressed the issue of whether the bankruptcy court had jurisdiction to consider Gulf's ADR Enforcement Motion, albeit rather inconclusively. The hearing transcript contains no clear ruling by Judge Blackshear on the question of jurisdiction (*see generally* Feb. 25 Tr.), though the order issued dismissing Gulf's adversary complaint indicates that it grants the Claimants' motion to dismiss, and that the basis for that motion was lack of subject-matter jurisdiction and improper venue (4457 Record at 227–28).

Although the record of the February 25 hearing is not a model of clarity, Judge Blackshear's ruling is best read as adopting the claimants' position that the NIL was timely filed (Feb. 25 Tr. 52), and that in any event the bankruptcy court lacked jurisdiction to revisit orders entered prior to the dismissal of the case (*id.* at 61).

### E. Gulf's Bankruptcy Appeals and Subsequent Events

As noted, the bankruptcy court dismissed the Adversary Complaint and denied the ADR Enforcement Motion by orders dated May 3, 2004. Gulf appealed both rulings. The ADR Enforcement appeal was docketed as 04 Civ. 4456 (the "4456 Appeal") and was assigned to this Court. The Adversary Complaint appeal was docketed as 04 Civ. 4457 (the "4457 Appeal") and was originally assigned to Judge Preska, but, because it is so closely related to the 4456 Appeal, was subsequently transferred to this Court. On appeal Gulf argues, *inter alia*, that the bankruptcy court retained jurisdiction to modify its prior orders, and that the facts before the bankruptcy court established that Claimants had not timely filed their NIL and were bound by the arbitration award.

In the meantime, while these appeals were pending, the Second Circuit vacated and remanded Judge Stanton's decision dismissing the New York Declaratory Action for improper venue. *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353 (2d Cir. 2005). In reaching its decision, the Second Circuit held that the "civil venue statute permits venue in multiple judicial districts as long as 'a substantial part' of the underlying events took place in those districts," and found that because a "substantial part" of the events in the New York Action "probably" occurred in New York, Gulf should have an opportunity to submit additional evidence on the question of venue. 417 F.3d at 356–58. Although it didn't resolve the question of bankruptcy venue, the court noted that it would "likely reject" that argument "for substantially the reasons given by the district court," *id.* at 348 n.4, namely, because Caldor's insurance coverage was excluded from its bankruptcy estate, and there was otherwise no "retained" bankruptcy jurisdiction, *Gulf Ins. Co.*, 2003 WL 22764542, at *3 (S.D.N.Y. Nov. 20, 2003).

That, in a nutshell, is where things stand now. The New York Declaratory Action is once again pending before Judge Stanton, where Gulf is attempting to litigate its obligations under the Policy. The New Jersey Declaratory Action is stayed pending outcome of that case. And Gulf's bankruptcy appeals, to which the Court now turns, are before this Court.

## STANDARD OF REVIEW

On appeal, a district court reviews a bankruptcy court's finding of facts under a clearly erroneous standard, Fed. R. Bankr. 8013, and its conclusions of law *de novo*, *In re AroChem Corp.*, 176 F.3d 610, 620 (2d Cir. 1999); *In re Bennett Funding Group, Inc.*, 146 F.3d 136, 138 (2d Cir.1998). Applying that standard, the Court will review these

consolidated appeals as follows:  First, whether the bankruptcy court had jurisdiction to entertain the ADR Enforcement Motion or the adversary proceeding will be reviewed *de novo*; second, the bankruptcy court's determination that the NIL was filed on August 20, 1999, which is a finding of fact, will be reviewed for clear error.

## DISCUSSION

### A.  The Bankruptcy Court has Subject-Matter Jurisdiction

The bankruptcy court articulated only one possible basis for finding that it did not have jurisdiction—section 349 of the Code—and that discussion was limited to its possible applicability to the ADR Program Order.  (*See* Feb. 25 Tr. 35.)  Section 349(b) of the Bankruptcy Code addresses the effects of dismissal of a case under title 11, and provides in relevant part:

> (b) Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title—
> . . .
> (2) vacates any order, judgment, or transfer ordered, under section 522(i)(1), 542, 550, or 553 of this title . . . .

11 U.S.C. § 349(b)(2).  By its terms, section 349(b)(2) vacates only those orders entered pursuant to the enumerated sections, specifically sections 522(i)(1), 542, 550, or 553.  *Id.*; *see also*, *e.g.*, *In re Davis*, 177 B.R. 907, 911 (B.A.P. 9th Cir. 1995) (stating that section 349 only vacates orders avoiding certain liens and transfers, and does not retroactively vacate the automatic stay or vitiate any cause of action based upon violation of the stay); *In re Blue Mountain Inv., Ltd.*, 186 B.R. 508, 512 (D. Kan. 1995) (noting that section 349(b)(2) only vacates orders entered pursuant to the enumerated provisions); *Matter of Depew*, 115 B.R. 965, 971–72 (Bankr. N.D. Ind. 1989) (concluding that section 349(b) should be restricted in its operation to the sections of the Code to which it specifically

refers, and therefore vacates only those orders or judgments which avoided transfers or interests pursuant to the powers given to the trustee or debtor-in-possession, and operates only as to property of the estate which was still property of the estate on the date of dismissal).  The ADR Program Order at issue in the 4456 Appeal was, by its terms, entered pursuant to 11 U.S.C. §§ 105, 327, 330, 362, and 363, 28 U.S.C. § 157(b)(5), and Federal Rules of Bankruptcy Procedure 2002(i) and 9019.  (4456 Record at 74.)  The First Lift-Stay Order and the Second Lift-Stay Order (which modifies the first), the vacation of which is sought in the first count of the complaint at issue in the 4457 Appeal, were entered pursuant to 11 U.S.C. §§ 105 and 362, and 28 U.S.C. § 157.  (*See* 4457 Record at 91, 136–37.)  Therefore, none of the orders challenged before the bankruptcy court were vacated after dismissal, and section 349 does not provide a basis for dismissing Gulf's complaint, or denying its motion.

This Court has not found additional authority supporting the proposition that the bankruptcy court lacks subject-matter jurisdiction to enforce or nullify orders previously entered in a now-dismissed bankruptcy case, even at this late stage.  Indeed, quite the opposite, "[i]t is . . . well established that bankruptcy courts retain jurisdiction after a case has been dismissed or closed to interpret or enforce previously entered orders."  *In re Williams*, 256 B.R. 885, 892 (B.A.P. 8th Cir. 2001) (citations omitted); *see also In re Menk*, 241 B.R. 896, 906 (B.A.P. 9th Cir. 1999) (noting that "[t]he bankruptcy court retains subject-matter jurisdiction to interpret orders entered prior to dismissal [as well as] post-dismissal jurisdiction to entertain a dispute over the propriety of a turnover order on remand from an appellate court," and holding that there is no jurisdictional requirement that a closed bankruptcy case be reopened before "arising under" jurisdiction

under 28 U.S.C. § 1334(b) can be exercised) (citing, *inter alia*, *In re Statistical Tabulating Corp.*, 60 F.3d 1286 (7th Cir. 1995), *cert. denied*, 516 U.S. 1093 (1996)). *Cf. In re Chateaugay Corp.*, 201 B.R. 48, 62 (Bankr. S.D.N.Y. 1996) ("Bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant under 28 U.S.C. § 1334.").  The first count in Gulf's adversary complaint, requesting that the bankruptcy vacate two of its prior lift-stay orders, and Gulf's motion to enforce the order establishing the ADR Program, plainly require the bankruptcy court to interpret its prior orders.  Clearly the bankruptcy court is uniquely qualified to determine whether to vacate or enforce orders it previously issued in the underlying bankruptcy case, over which it had unquestioned jurisdiction.  *See In re Petrie Retail Inc.*, 304 F.3d 223, 230 (2d Cir. 2002) ("A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders . . . ."); *In re Allegheny Health, Educ. & Research Found.*, 383 F.3d 169, 176 (3d Cir. 2004) (finding that bankruptcy court retained post-dismissal jurisdiction over suit and counterclaim "[b]ecause the bankruptcy court correctly determined that [appellant]'s suit to vacate the arbitration award and [appellee]'s counterclaim to enforce it required the court to interpret [its previously entered] sale orders"); *In re Williams*, 256 B.R. at 892 (noting that even where the bankruptcy court "is not actually construing or enforcing its own orders, but enforcing the reversal of one its orders, the principle is the same; the latter is merely a corollary of the first").

Accordingly, the Court concludes that the bankruptcy court retained post-dismissal subject-matter jurisdiction to determine whether to grant or deny the motion to enforce the ADR Program Order, and to determine whether to dismiss the adversary

complaint which sought, *inter alia*, to nullify the Lift-Stay Orders granted during Caldor's bankruptcy case.

## B. The Bankruptcy Court's Finding that the NIL Was Timely Filed Is Not Clearly Erroneous

Having determined that the bankruptcy court had subject-matter jurisdiction to entertain the motions below, the Court now turns to the factual findings forming the basis of the bankruptcy court's May 3, 2004 orders, and concludes that there was no clear error.

A finding is "'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). By contrast, there is no clear error "simply because [a reviewing court] is convinced that it would have decided the case differently." *Id.* Indeed, it is paramount that, if the original determination "is plausible in light of the record viewed in its entirety, [a reviewing court] . . . may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* Thus, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949)).[5]

Gulf begins its argument on appeal by attempting to circumvent the clear error standard in favor of *de novo* review. Its claim, in essence, is that "the Bankruptcy Court did not have before it two sets of permissible facts to consider"; rather, according to Gulf, the "only admissible fact presented [below was that the NIL was] . . . filed on September

---

[5] "This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Anderson*, 470 U.S. at 573.

1, 1999." (4456 Appellant's Reply Mem. 2). As it did below, Gulf now contends that the opinion of Claimants' counsel that the NIL was timely does not "prove the ['fact']" that the NIL was filed on August 20. (4456 Appellant's Supp. Mem. 6). Indeed, according to Gulf, Claimants' counsel "has no personal knowledge" that the NIL was timely filed because "[h]e did not deliver it", and "he was not present when the deputy clerk alleged [sic] signed it on August 20." (*Id*. at 16–17, 25). For this reason, Gulf argues that absolutely "no deference" should be afforded the bankruptcy court's finding that it was. (4456 Appellant's Reply Mem. 2).

Although it is of course true that Claimants' counsel's opinion that the NIL was timely filed is not evidence, this Court cannot agree that the bankruptcy court had before it only one permissible choice. Gulf's position, essentially, is that without some <u>direct</u> evidence of the August 20 filing date, it was clear error to disregard the September 1 date stamp. Indeed, according to Gulf, no deference would be appropriate in this case unless Claimants had either (i) produced the bankruptcy clerk who received the NIL on August 20, 1999; (ii) produced the person who signed the Acknowledgement of Service Card on August 20; or (iii) produced the delivery person who brought the NIL to the court for filing on August 20. (Appellant's 4456 Supp. Mem. 16–18). Not surprisingly, no such direct evidence is available.

But that certainly does not mean that this Court must eschew the clear error standard in favor of *de novo* review. Gulf does not cite—and neither has this Court found—any support for such a shift. To the contrary, even a cursory case search reveals that courts routinely employ a clear error standard when reviewing factual determinations *based only on circumstantial evidence*. *See, e.g.*, *U.S. v. Khedr*, 343 F.3d 96, 110 (2d Cir.

2003) ("Because a preponderance of the circumstantial evidence in this case does indicate that [the defendant] more likely than not directed the . . . removal of a computer from his office, the district court's finding of obstruction does not constitute clear error."); *Matter of Sheridan*, 57 F.3d 627, 634 (7th Cir. 1995) (bankruptcy court's findings as to whether intent to deceive should be inferred from circumstantial evidence admitted in case would be reviewed only for clear error). And the Supreme Court has made clear that circumstantial evidence can be as—if not more—persuasive than direct evidence. *Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 508 n.17 (1957) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.").

So the question in this case remains, then, whether the bankruptcy court committed clear error in deciding, based only on the available *circumstantial* evidence, that the NIL was filed on August 20. As noted above, that evidence was as follows: (i) an August 19, 1999 cover letter communicating that the NIL was being filed with the bankruptcy court (4457 Record 131); (ii) the sworn statement of Claimants' counsel at the time—Robert Fendt—that he gave the letter, along with the NIL, to the New Jersey Lawyers Service "for filing" on August 19, 1999 (4456 Record at 207); and finally, (iii) the acknowledgment of service card, which was addressed to the Bankruptcy Court, notes "Glasbrenner" at the top, and was signed as received on August 20, 1999 (4456 Record at 272).

On this record, Gulf argues that the bankruptcy court committed clear error for two reasons. First, because the court ignored several deficiencies in the evidence; and second, because the bankruptcy court failed to apply a presumption of correctness to the

September 1 filing date—a presumption Gulf claims can only be rebutted by "overwhelming" evidence—as required by Local Rule 5001-1 of the Bankruptcy Court for the Southern District of New York, or Local Rule 1.2 of the District Court. Gulf then claims that the court abused its discretion in failing to take judicial notice of the September 1 filing date, as required by Federal Rule of Evidence 201. The Court will address these points in turn.

### 1. Alleged Evidentiary Defects

Gulf initially argues (as it did at the hearing) that the acknowledgment of service card and cover letter suffer from several defects. First, Gulf notes that while it was clear that something was filed on August 20, 1999, it was unclear exactly *what* was filed with the card. (Feb. 25 Tr. 15.) Second, Gulf argues that just because the service card is dated August 20 does not mean it was actually signed that day (the implication being that the Service Card could have been backdated). (Feb. 25 Tr. 22.) Third, Gulf claims that the card is littered with minor inconsistencies and errors, including an incorrectly noted date and mistake in the location of the bankruptcy court's intake office. Finally, Gulf points out that the cover letter is not dated, and contends that the acknowledgment of service card is not admissible because it has never been authenticated.

None of these points support a conclusion that the bankruptcy court's finding was clearly erroneous. Rule 901(a) of the Federal Rules of Evidence provides that the document authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a). Rule 901(b) further provides that testimony of a witness with knowledge provides appropriate authentication. Fed. R. Evid. 901(b); *see also* Charles Alan Wright, et al.,

10A *Fed. Practice & Procedure* 3d § 2722 (2005) ("To be admissible, documents must

be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)

and the affiant must be a person through whom the exhibits could be admitted into

evidence.").

In this case, Claimants' attorney at the time the NIL was filed has provided a

sworn statement to the effect that the acknowledgment of service card "is a true and

correct copy of the [card] . . . from the Clerk of the United States Bankruptcy Court for

the Southern District of New York, dated August 20, 1999." (4456 Record at 207). That

representation, along with the surrounding circumstances and characteristics of the card,

is enough to authenticate under Rule 901. Claimants' attorney would have received the

card back from the bankruptcy court (via the messenger service) at the time, as suggested

by the cover letter accompanying the NIL for filing, which asks the court to return to him

a date-stamped copy of the NIL. Such personal knowledge is all that is required. *See,

e.g.*, *Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 262 F.Supp.2d 50,

58 (S.D.N.Y. 2003) (attorney for the firm has personal knowledge that the documents

attached to an affidavit were obtained during discovery by the firm, which is enough for

authentication purposes).

Gulf next argues that even if authentic, the card (and cover letter) suffer from

inconsistencies and defects. Gulf points out that the date on the acknowledgment of

service card is entered incorrectly, and that the wrong floor is indicated.[6] In addition, the

cover letter does not contain a date stamp of August 20, although Gulf offers no evidence

---

[6] The Card provides that service is acknowledged "this _____ day of _____ 19 __." (4456
Record at 272). In what can only be described as a ministerial error of no consequence, the Card is actually
filled out as received "this 8th day of 20, 1999", which is clearly an analog for 8/20/1999. For the same
reason, it is of little moment that the Card incorrectly indicates "sixth fl.", when in fact the bankruptcy
court's "intake office" is located on the fifth floor. (4456 Appellant's Supp. Mem. 16).

that cover letters are usually date stamped when they accompany papers for filing. In any

event, none of these issues affect the admissibility of the evidence. They may affect its

weight, but that is not an appropriate consideration on appeal. *See, e.g.*, *Joseph v. New

York City Bd. of Educ.*, 171 F.3d 87, 93 (2d Cir. 1999) ("The fact that there may have

been evidence to support an inference contrary to that drawn by the trier of fact does not

mean that the findings were clearly erroneous. . . .The weight of the evidence is an

argument to be made to the factfinder at trial, not a ground for reversal on appeal."). It is

true, of course, that the service card does not indicate exactly what was filed on August

20, and it remains possible that the card was backdated. But this Court cannot reverse the

bankruptcy court on either of those bases, simply because alternate explanations of the

documents are plausible. *Id.* ("'Where there are two permissible views of the evidence,

the factfinder's choice between them cannot be clearly erroneous.'") (quoting *Anderson*,

470 U.S. at 575). There is almost always some uncertainty in circumstantial evidence,

some "what if" scenario that would render it unreliable. But those types of

determinations, which go to the weight of the evidence, are to be made by the

factfinder—in this case the bankruptcy court—and are therefore not appropriately

considered on appeal. *See id*.

### 2.  The Presumption of Correctness

Gulf next claims that the bankruptcy court failed to presume the September 1,

1999 date stamp to be the actual filing date, as it was purportedly required to do under

Local Bankruptcy Rule 5001-1 and Local Rule 1.2 of the District Court. To begin,

neither of these rules, which apply to papers filed "after hours" in the court's night

depository box, appears to apply to this case. Both rules say that "[s]uch papers will be

considered as having been filed in the district court as of the time and date stamped thereon, which shall be deemed presumptively correct." *See, e.g.*, Local Rule 1.2 of the Locals Rules of the United States District Courts for the Southern and Eastern Districts of New York. Neither rule, however, says that date-stamps are presumptively correct when papers are filed in person, and in particular where the clerk's office signs an acknowledgement of service card indicating a different filing date.

But assuming there is a presumption of correctness, the cases cited by Gulf do not support its position that litigants face an "overwhelming"—or otherwise heightened—burden in rebutting it. (Appellant's 4456 Supp. Mem. 23 n.7); *In re Schleier*, 290 B.R. 45 (Bankr. S.D.N.Y. 2003) (holding that "the date and time-stamp on a bankruptcy petition creates a rebuttable presumption as to when it was filed"). In *Cardente v. Fleet Bank of Maine, Inc.*, 146 F.R.D. 13 (D. Me. 1993), one of the questions was whether plaintiff filed a timely opposition to a motion to dismiss. Plaintiff claimed it was filed on June 10, 1992; defendant argued that it was not filed until June 15, 1992, the date on which it was stamped by the clerk's office.

Before resolving the dispute, the *Cardente* court held an evidentiary hearing on the subject, where it heard testimony from employees in the clerk's office as well as counsel for plaintiff, who claimed that when he arrived to file the opposition papers the clerk's office was closed, so he slid the documents under the door. *Id.* at 17. After considering the testimony—and explicitly rejecting plaintiff's counsel's—the court concluded that it was "totally implausible" that the "document was delivered" but "remained on the floor" for two days without being discovered. *Id.* at 18. Rather, the

Court went on to note that there was "strong circumstantial evidence" that the filing was made on June 15:

> It was time and date stamped in the middle of a large group of documents time and date stamped around the time the mail usually arrives in the Clerk's Office. While previous pleadings in this case had borne the legend HAND-DELIVERED when they were hand-delivered, this pleading did not. Moreover, it is clear that the copy of the pleading was mailed to opposing counsel on June 10th. The Court address on counsel's transmittal letter included a no-longer used (and long-discontinued . . .) post office box number, which might account for the delay in postal delivery. The Court finds, therefore, as it did in its original order, that Plaintiffs' response to Defendant Fleet's Motion to Dismiss was filed on June 15, 1992.

*Id.* at 19. Thus, although the *Cardente* court ultimately found that the document was filed on the day it was date-stamped, it did so only after carefully considering and rejecting the possibility that it had been filed earlier. In reaching its decision, the court relied heavily on circumstantial evidence, as did the bankruptcy court in this case.

Gulf also cites *In re Hanscom*, 275 B.R. 183 (Bkrtcy. D. R.I. 2002). In *Hanscom*, the issue was again whether a filing was made earlier than a date stamp. In deciding that the date stamp was correct, the *Hanscom* court did not explicitly apply a presumption; rather, as in *Cardente*, the court undertook a thorough analysis after holding an evidentiary hearing on the subject, at which it heard testimony from the employee in the clerk's office who received the filing, as well as the debtor's counsel's assistant, who claimed to have delivered it on October 15, a day earlier than the October 16 date-stamp:

> [The employee] testified that she was the clerk who accepted the six new bankruptcy petitions on October 15, that she opened all of the envelopes, and does not recall seeing any other documents. . . . She said that if the motion in question was included with the petitions and was somehow overlooked the prior afternoon, she could not have missed it while processing the petitions in the morning. [She also] stated that she can think of no scenario where a document is filed on the 15th but does not get time stamped until 4:10 p.m. on the 16th, and reiterated that if the motion

> to extend time was with the six bankruptcy petitions [filed on the 15th],
> and was somehow overlooked when delivered for filing, it would have
> been time stamped, *at the latest,* the morning of October 16th when all the
> petitions were processed.

*Id*. at 186 (emphasis in original). After considering the above testimony, the *Hanscom*

court made the factual determination that "the motion [in question] . . . was filed at 4:10

p.m. on October 16, 2001, as file marked." *Id*. The court went on to note that, "[w]hile

the Clerk's office is by no means infallible," there was strong *circumstantial* evidence

that no mistake had been made in that case:

> [I]t is telling that the motion in dispute was time stamped at 4:10 p.m., the
> time that [the debtor's counsel] generally arrives at the Clerk's office.
> Given the level of scrutiny that new petitions receive when being opened,
> I accept as reasonable [the clerk's office's] explanation that even if the
> subject document was in fact delivered, but overlooked on the evening of
> October 15, 2001, the intake clerk surely would have seen the paper on the
> morning of October 16th, and would have time stamped it accordingly, *in
> the a.m.* . . . [The clerk's office's] . . . testimony is accepted simply
> because it makes common sense and is basically just more believable than
> the [debtor's] version of what happened here.

*Id.* As in *Cardente*, the *Hanscom* court seriously considered the possibility that

the date stamp was incorrect. That it ultimately determined there was insufficient

evidence to support that conclusion does not support Gulf's position in this case,

where the available evidence included a signed acknowledgment of service card

with an earlier date.

Finally, Gulf cites *In re Koch*, 2003 WL 221846 (Bankr. D. Vt. Jan. 8, 2003),

where the bankruptcy court found that a complaint was filed on December 30, 2002,

which was the date the document was "received and time-stamped by the Clerk's office."

*Id.* at *1. But the *Koch* court does not indicate that there was any evidence of a different

filing date, which means that the date stamp was the only available evidence, as well as

the presumptively "best" evidence. Although the *Koch* court does at one point express its belief that "[a] document is not considered filed with the Clerk's Office until received and time-stamped by the Clerk's Office," this Court finds nothing in the language of Fed. R. Bankr. P. 7005(e)[7] or 8008(a)[8]—the only cited authority—to support that conclusion. Filing is all that is required; and as the bankruptcy court in this case noted, "filing" is defined in Black's as "the act of delivering documents to the proper authority". (Feb. 25 Tr. 10–12); *see also In re Godfrey*, 102 B.R. 769, 771 (9th Cir. 1989) (finding that a petition was "filed" when it was first placed in possession of the clerk)*; Gilardi v. Schroeder*, 833 F.2d 1226, 1233 (7th Cir. 1987) (holding a complaint is filed when it reaches the custody of the clerk, even if it fails to conform with the formal requirements of local rules).

So there is nothing in these cases to support Gulf's argument that only "overwhelming" evidence can rebut a presumption of correctness afforded to a date stamp. A fourth case cited by Gulf, *In re Schleier*, 290 B.R. 45 (S.D.N.Y. 2003), where the question was again whether a petition was filed earlier than its date stamp, nicely illustrates this point. In setting up its discussion of the filing issue, the *Schleier* court was careful to point out that, although it would consider the date stamp to be presumptively correct, the presumption could be rebutted if the "debtor . . . submit[ted] evidence that demonstrates the petition was filed at a different time, i.e., earlier." *Id.* at 50. Nowhere does the court use—or even imply—that the required evidence be "overwhelming."

---

[7] Rule 7005(e), which parrots Fed. R. Civ. P. 5(e), states, in relevant part, that "[t]he filing of papers with the court as required by these rules shall be made by filing them with the clerk of the court." Fed. R. Bankr. P. 7005(e). The rule says nothing about date stamping.

[8] Likewise, Rule 8008(a) provides, in part, that "[p]apers required or permitted to be filed with the clerk of the district court or the clerk of the bankruptcy appellate panel may be filed by mail addressed to the clerk, but filing is not timely unless the papers are received by the clerk within the time fixed for filing," Fed. R. Bankr. P. 8008(a), but does not mention date stamping.

Rather, the court simply notes that "[t]he evidence must show that when the petition was presented to the office of the clerk, it was in acceptable filing form, and was received by a representative of that office." *Id.*

In finding that the presumption had been rebutted, the *Schleier* court relied on the following "uncontroverted" evidence:

> Schleier [the person who dropped off the petition] testified, among other things, that on June 28, 2002, (i) [a friend drove her] to the White Plains Courthouse, (ii) because she wasn't feeling well that morning, [the friend] dropped her in front of the building at 8:50 a.m., (iii) she went through security, up an elevator, walked into the clerk's office, (iv) she went to the counter where she handed her petition to a deputy clerk and offered full payment of the filing fee in cash at or between 8:55 and 9:00 a.m., (v) the deputy clerk accepted her petition and came from behind the counter and they sat down together at a table, and (v) while sitting at the table, the deputy clerk explained what other papers were needed to complete her skeleton petition.

*Id.* at 54. After finding this testimony—along with corroborating testimony from the friend—to be "credible and undisputed," the *Schleier* court found that the petition was filed earlier than the time at which it was stamped.

In reaching this decision, the *Schleier* court was not faced with "overwhelming" evidence. The evidence was, however, undisputed, as are the following facts in this case: (i) an August 19, 1999 cover letter communicating that the NIL was being filed with the bankruptcy court (4457 Record at 131); (ii) the sworn statement of Claimants' counsel that he gave the letter, along with the NIL, to the New Jersey Lawyers Service "for filing" on August 19, 1999 (*id.* at 207); and finally (iii) the acknowledgment of service card, which was addressed to the Bankruptcy Court, notes "Glasbrenner" at the top, and was signed as received on August 20, 1999 (*id.* at 272). This evidence was certainly enough to overcome any rebuttable presumption that applied to the date stamp in this

case.  Accordingly, the Court finds no clear error in the bankruptcy court's determination that the NIL was filed on August 20, 1999.

### 3.  Judicial Notice

Gulf's remaining argument, that the bankruptcy court "abused its discretion" in refusing to take judicial notice of the September 1, 1999 filing date, is similarly unavailing.  (4456 Appellant's Supp. Mem. 19.)  It is of course correct that certain adjudicative facts—including filing dates—are frequently established through application of the "judicial notice" doctrine.  Fed. R. Evid. 201.  But Federal Rule of Evidence 201 sets clear limits on the kinds of facts that are noticeable, namely those that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Although Rule 201(d) directs that courts "shall" take notice when either party so requests and provides the necessary information, that language is certainly subject to the limitation set forth in subsection (b), which requires that the fact to be noticed "not [be] subject to reasonable dispute."  Fed. R. Evid. 201(b), (d).  Given the evidence described above, the NIL filing date was clearly in dispute, which takes it outside the scope of Rule 201.  The bankruptcy court's refusal to take judicial notice of the filing date was therefore not an abuse of discretion.

## CONCLUSION

For the foregoing reasons, the Court upholds the decisions of the bankruptcy court

to dismiss the adversary complaint and to deny the motion to enforce the ADR Program

Order. The Clerk of the Court is directed to close these cases.

SO ORDERED.

Dated: New York, New York
     May 22, 2006

Richard J. Holwell
United States District Judge